IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BRITTANY WADDELL                                                                              PLAINTIFF

V.                                                            CIVIL ACTION NO. 1:19-CV-88-SA-DAS

TISHOMINGO COUNTY, MISSISSIPPI, ET AL.                                            DEFENDANTS

AMENDED ORDER AND MEMORANDUM OPINION[1]

Waddell initially named numerous individuals and municipalities as Defendants in this action. *See* [1], [42]. However, the only remaining Defendants are Tishomingo County and Tishomingo County Deputies Thomas Mynatt and Shane Stegall. Deputies Mynatt and Stegall filed a Joint Motion for Summary Judgment [155], and Tishomingo County filed a separate Motion for Summary Judgment [157]. Those Motions [155, 157] have been fully briefed and are now ripe for review.

*Relevant Factual and Procedural Background*[2]

This lawsuit arises from a police chase that began on February 1, 2018 shortly before midnight. The police chase involved a black Jeep. Samuel Rice was the driver of the Jeep, and Waddell was riding in the Jeep as a passenger.

The pursuit began in the city limits of Corinth, Mississippi when officers of the Corinth Police Department attempted to initiate a traffic stop of the Jeep, allegedly for a tag light violation. Rice refused to stop and instead fled from the officers. A high-speed chase ensued. When the Jeep crossed into the City of Farmington, Mississippi, Officer Loyd of the Farmington Police

---

[1] The Court enters this Amended Order and Memorandum Opinion to correct minor typographical errors in its previous Order and Memorandum Opinion [175] entered on March 2, 2022. This Amended Order and Memorandum Opinion is identical to the previous filing in all other respects.
[2] The Court set forth the relevant factual and procedural background in its prior Order and Memorandum Opinion [145]. There is, predictably, much overlap in that factual recitation and the explanation set forth herein.

Department joined the chase after clocking the Jeep travelling at 81 miles per hour. Once the Jeep exited Farmington's city limits and entered the jurisdiction of Alcorn County, Mississippi, Deputy Timothy Boggs of the Alcorn County Sheriff's Department took over the lead position in attempting to catch the Jeep. The Corinth Police Department ceased its efforts in the chase at some point after Officer Boggs took over the lead position; however, Officer Loyd remained part of the pursuit.

Once Officer Boggs entered the chase, the pursuit reached speeds up to 90 miles per hour, and Rice exhibited erratic driving patterns.[3] The chase ultimately reached Tishomingo County on County Road 302. Rice then turned down a logging road off County Road 302 into a rural wooded area known as "Sharpe's Bottom." The road was muddy, and Officer Boggs' police cruiser got stuck in the mud. The Jeep continued down the logging road.

Prior to the chase reaching "Sharpe's Bottom," Deputies Mynatt and Stegall of the Tishomingo County Sheriff's Department had not been involved. However, once the chase reached Tishomingo County, they were called to the scene to assist with the apprehension of the Jeep's driver. When Deputies Mynatt and Stegall arrived at the scene, Officer Loyd and Deputy Boggs briefed them on the events that had transpired. Deputy Stegall then left to patrol the area in hopes of locating Rice and the Jeep. Deputy Mynatt stated that he, along with Deputy Boggs, "stayed on county road 302, due to we could not get our patrol vehicle back that far." [155], Ex. 3.

According to Waddell, once they separated from law enforcement on the logging road, Rice and Waddell both exited the vehicle. The two became involved in an argument, and she decided that she "was going to walk." [121], Ex. 1 at p. 37. However, around this same time,

---

[3] As noted in its previous Order and Memorandum Opinion [145], the Court has reviewed and considered a dash camera video from Officer Boggs' police cruiser which was attached as an exhibit to previous filings. *See* [85], Ex. 1.

2

Officer Voyles of the Mississippi Department of Wildlife, Fisheries, and Parks (who was in his truck) and Officer Loyd (who was on foot) arrived in the vicinity. The Court's previous Order and Memorandum Opinion [145] set forth the next events as follows:

> The convergence of all accounts indicates that once the Jeep was sighted by Officer Voyles, in his truck, and Officer Loyd, who was on foot, Rice simultaneously became aware of their presence. Waddell testified that Rice stated to her that he knew they were approaching. Rice restarted the Jeep, turned on the lights and began to move toward Officer Voyles' truck. At that moment, Officer Voyles activated his spotlight and blue lights to alert the Jeep to stop and to illuminate the dark area. Officer Voyles positioned his truck in the road in an attempt to block the Jeep's path. However, rather than stopping, the Jeep rammed the truck on the front driver's side fender and was able to continue back up the logging road toward County Road 302. In the immediate aftermath of ramming and surpassing Officer Voyles' truck, the Jeep accelerated toward Officer Loyd who was standing in the logging road with his flashlight and service weapon while instructing Rice to stop. The Jeep accelerated toward Officer Loyd and when it was in the immediate zone of danger, Officer Loyd jumped out of the way to his left. According to Officer Loyd, the Jeep then changed direction to target him. It was then that he discharged his pistol at the Jeep's front right tire. As the Jeep continued back up the logging road, Officer Loyd again discharged his pistol at the back tires in an attempt to disable it. However, it is apparent from the record that this was not the moment in which the Plaintiff was injured. Officer Loyd got into the truck with Officer Voyles at that time, and they continued to pursue the Jeep at which point Officer Voyles radioed the Officers still located at the logging road entrance.

[145] at p. 3.

In his written statement, Deputy Mynatt stated that, although he was on County Road 302 and not in the immediate vicinity, he heard the gunshots referenced above. *See* [155], Ex. 3. At about this same time, Deputy Stegall arrived back to the entrance of the logging road. In his written statement, Deputy Stegall did not state that he heard the above-referenced gunshots but stated that "[Deputy] Boggs also informed me that shots had been fired prior to my arrival." [155], Ex. 4.

At that time, the Jeep began heading toward the logging road entrance, which is where Deputies Mynatt and Stegall were located. As to the following events, Officer Loyd testified:

> Officer Voyles and I followed the Jeep. As we approached, the Jeep headed toward the other officers. The Jeep appeared to get stuck, and Deputies Mynatt and Stegall approached and commanded the driver to shut off the engine and exit the vehicle. As I approached the vehicle to assist, the Jeep began reversing toward Officer Voyles and me. I heard Deputy Mynatt yell. I then fired shots into the left rear tire and jumped to the left on a hill and fired shots at the left front tire. The Jeep changed directions and headed forward. Deputies Mynatt and Stegall both fired shots at the vehicle. I later learned that the Jeep had struck Deputy Mynatt.

[85], Ex. 2 at p. 2-3.[4]

In his written statement, Deputy Mynatt similarly stated that the Jeep was travelling at a high rate of speed and "attempted to hit Deputy Stegall and Deputy Boggs." [155], Ex. 3. Further, Deputy Mynatt stated that Deputy Stegall began shooting at the vehicle and that, after the vehicle came to a stop, Deputy Mynatt approached the driver side of the Jeep and attempted to open the door. According to Deputy Mynatt, "[t]he driver placed the vehicle in revers[e] and hit the gas. The vehicle hit my left side of my body and I fell to the ground. I began to shoot into the driver side of the vehicle." *Id*. Deputy Stegall also admitted to firing shots into the Jeep as it was fleeing. [155], Ex. 4 at p. 1.[5]

Eventually, the Jeep was able to flee and get back to County Road 302. However, after only traveling a short distance, Rice stopped the Jeep on the side of the road. Rice fled on foot into

---

[4] For the sake of clarity, the Court notes that Waddell reentered the Jeep before Rice started driving again.
[5] The Court notes that Waddell's deposition was attached as an exhibit to various filings in this case. The Court has reviewed it carefully. Although Waddell provides some explanation of these events, she admits that she had difficulty hearing anything due to the sound of the Jeep. *See* [155], Ex. 1 at p. 44-45. In addition, she stated that she was laying down in the back of the Jeep and did not know whether Rice drove toward the law enforcement officers or around them when fleeing back toward County Road 302. *See* [155], Ex. 1 at p. 77-78. Thus, she does not have any personal knowledge contrary to Deputy Mynatt's and Deputy Stegall's explanation of events concerning the time period immediately surrounding the gunshots.

the surrounding wooded area, and Waddell remained in the Jeep. Some of the law enforcement officers pursued Rice and others attended to Waddell, who had been shot and injured in the pursuit. Emergency personnel were called to the scene to aid Waddell with her injuries.

Waddell initiated this action on April 30, 2019, and she later filed an Amended Complaint [42] on November 13, 2019. Waddell's claims against all Defendants, other than Deputy Mynatt, Deputy Stegall, and Tishomingo County, have been dismissed either through previous Orders [103, 104, 145] or by stipulation of the parties. As to Deputies Mynatt and Stegall, Waddell has asserted Section 1983 claims for excessive force in violation of the Fourth Amendment and a substantive due process claim in violation of the Fourteenth Amendment. Concerning Tishomingo County, she asserts a Section 1983 failure to train claim and a state law negligence claim. Through the present Motions [155, 157], the Defendants seek dismissal of all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that

5

there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

The Court will first address Deputies Mynatt and Stegall's Motion [155] and then turn to Tishomingo County's Motion [157].

I. *Deputies Mynatt and Stegall*

In response to Waddell's Fourth and Fourteenth Amendment claims against them, Deputies Mynatt and Stegall raise the defense of qualified immunity. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 391 (5th Cir. 2017) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012)) (internal quotation marks and additional citation omitted). "A plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Williams v. Anderson*, 2018 WL 4212410, at *3 (N.D. Miss. Sept. 4, 2018) (quoting *Da Vinci Inv., Ltd. P'ship v. Parker*, 622 F. App'x 367, 374 (5th Cir. 2015); *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)). Applying this framework, the Court will first

consider whether the Deputies violated Waddell's constitutional rights. The Court turns initially to her Fourth Amendment claim and will then analyze her Fourteenth Amendment claim.

The Fourth Amendment guarantees an individual's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Consequently, to prevail on an excessive force claim, Waddell must show that the use of force was excessive, and "that the excessiveness of the force was unreasonable." *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

In its previous Order and Memorandum Opinion [145], the Court set forth an explanation of the United States Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Due to the factual similarities of that case and the case at bar, the Court feels compelled to note that decision again here.

In *Scott*, a deputy clocked the plaintiff's vehicle traveling almost 20 miles per hour above the speed limit and attempted to initiate a traffic stop. *Id*. at 374. The plaintiff refused to stop, and a high-speed chase ensued. *Id*. The defendant (another deputy) took over the lead in the chase and, after travelling at speeds in excess of 85 miles per hour in a chase that had lasted over six minutes, attempted to end the chase by employing a "Precision Intervention Technique." *Id*. at 375. That technique involves bumping the fleeing vehicle with a push bumper that causes the vehicle to spin to a stop. *Id*. As a result of the defendant's application of this technique, the plaintiff "lost control of his vehicle, which left the roadway, ran down an embankment, overturned, and crashed. [The plaintiff] was badly injured and was rendered quadriplegic." *Id*. The district court denied qualified immunity, and the Eleventh Circuit affirmed that decision. *Id*. at 376.

The Supreme Court reversed, holding that the defendant was entitled to qualified immunity. *Id*. at 377. In particular, the Supreme Court noted that "in judging whether [the

defendant's] actions were reasonable, we must consider the risk of bodily harm that [the defendant's] actions posed to [the plaintiff] in light of the threat to the public that [the defendant] was trying to eliminate." *Id*. at 383. The Court continued: "Although there is no obvious way to quantify the risks on either side, it is clear from the videotape that [the plaintiff] posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id*. at 383-84. While also recognizing that the defendant's actions certainly involved risk to the plaintiff, the Supreme Court noted:

> So how does a court go about weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person? We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was [the plaintiff], after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the defendant] confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing [the defendant] for nearly 10 miles, but he ignored their warning to stop. By contrast, those who might have been harmed had [the defendant] not taken the action he did were entirely innocent. We have little difficulty in concluding it was reasonable for [the defendant] to take the action that he did.

*Id*.

This Court also cited *Thompson*, 762 F.3d 433, in its previous Order and Memorandum Opinion [145]. In *Thompson*, a 2014 case, the Fifth Circuit applied the *Scott* standard to a vehicular flight situation and ultimately held the law enforcement officer's firing of an assault rifle directly into the truck was reasonable under the circumstances. *Id*. at 438. In reaching that conclusion, the Fifth Circuit considered the fact that the suspect was at times travelling in excess of 100 miles per hour, ran multiple stop signs, and recklessly drove on the wrong side of the road. *Id*. Ultimately, the Fifth Circuit held that "after multiple other attempts to disable the vehicle failed, it was not

8

unreasonable for [the defendant] to turn to deadly force to terminate the dangerous high-speed car chase." *Id*. (citation and quotation marks omitted).

Against this backdrop, the Court turns to Waddell's arguments. Waddell contends that qualified immunity should be denied because the Deputies' use of force was unreasonable. In particular, she avers that the dash cam footage from Deputy Boggs' cruiser is not relevant because it ends prior to the events that occurred at "Sharpe's Bottom." Furthermore, she argues that there was no danger to civilians because "the dash cam footage does not show there were any civilian motorists or pedestrians present at all. Thus, there could not have been any danger in that regard." [163] at p. 9. Waddell also asserts that any danger which the Jeep may have posed had subsided by the time the shots were fired into the Jeep. Particularly concerning Deputy Stegall, Waddell asserts "Deputy Stegall has provided no information to show why he was in fear at all. . . Deputy Stegall did not provide how close the Jeep was to him or any of the officers or deputies when he began to open fire. Simply because the Jeep was coming towards him is not enough[.]" [163] at p. 11. As to Deputy Mynatt, Waddell avers "there is a question of fact resonating around when Deputy Mynatt shot and whether he actually was hit by the Jeep. From Deputy Mynatt's statement, he fell when the vehicle reversed, and then, he started shooting. But in Deputy Stegall's statement, he saw and heard Deputy Mynatt still giving loud verbal commands even after the Jeep began moving forward." [163] at p. 12.

The Court will address these arguments in turn. First, the Court rejects the contention that the dash cam footage is irrelevant. Although the footage ends prior to the gunshots, the footage is relevant to the extent that it shows the manner in which Rice was driving. As noted above, the footage shows that the Jeep was travelling erratically at an extremely high rate of speed. This is certainly relevant as the law enforcement officers would have been justified in desiring to prevent

9

the Jeep from returning to the main roadways. The Jeep posed a risk to other individuals who may have been on the roadway. By that same token, the Court also rejects Waddell's contention that there was no risk to the public because there were no pedestrians or other vehicles present during the entire dash cam video. It would be illogical, in the Court's view, to find that Rice did not pose a risk to the general public simply because he did not happen to pass any other vehicles or pedestrians during the video. Rice was undoubtedly travelling erratically, placing himself, Waddell, and the pursuing officers in danger. While Rice is fortunate that no other persons were travelling on the roadway, that fact does not increase the Deputies' culpability. In fact, the Fifth Circuit has previously rejected a similar argument, holding that "this court recognizes the 'inherent danger' of vehicular flight, 'even when no bystanders or other motorists are immediately present.'" *Thompson*, 762 F.3d at 439 (quoting *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 580 (5th Cir. 2009)).

Waddell's next argument is that any danger the Jeep posed had subsided by the time Deputies Mynatt and Stegall discharged their firearms. The Court rejects this argument as well. The written statements of both Deputies are consistent—when attempting to leave "Sharpe's Bottom," the Jeep drove toward the law enforcement officers and was consistently changing directions and driving recklessly. Officer Loyd's affidavit is also consistent with the Deputies' statements. Furthermore, as noted above, Waddell, who was laying down in the back of the Jeep at this particular point in time, admitted that she did not know whether Rice drove toward the Deputies, specifically testifying as follows:

> **Q.** So you don't know at that point which way he drives? You don't know –
>
> **A.** I just know he went forward.
>
> **Q.** Right.

10

> A. I don't know if it was – *I don't know if it was another road on the side or if he went beside them, I have no idea.*
>
> Q. All right. So, you don't – you don't know if was towards them, you don't know if it's around them, you have no way of knowing where he went?
>
> A. Yes, ma'am.

[155], Ex. 1 at p. 78 (emphasis added).

Recognizing Waddell's admitted lack of personal knowledge on this point and the fact that she has provided no other evidence which would contradict the above-referenced version of events provided by Deputies Mynatt and Stegall and Officer Loyd, the Court rejects her argument.

Ultimately, in analyzing whether the Deputies' actions were reasonable, this Court must consider the risk of bodily harm that the Deputies' actions posed in light of the threat to the public the Deputies were attempting to eliminate. *See generally Scott*, 550 U.S. at 383-84. Even viewing the facts in the light most favorable to Waddell, the Deputies' conduct was justified. The Jeep had refused to comply with the directions of law enforcement, travelled erratically at high rates of speed across multiple counties and municipalities, continued to drive recklessly in "Sharpe's Bottom," and was apparently attempting to flee back to the public roadway. The Jeep undoubtedly posed a threat to the public, and it is likewise posed a threat to the law enforcement officers in the area. Although the fact that Waddell was injured is tragic, the Court finds that the Deputies' use of force was reasonable. Waddell's Fourth Amendment claim therefore must fail. Summary judgment is hereby GRANTED on that claim.[6]

---

[6] Waddell also tries to create a question of fact based upon the fact that Deputy Mynatt's statement indicates that he was hit by the Jeep when the Jeep began to reverse after he tried to open the door. Waddell points to Deputy Stegall's statement that he saw Deputy Mynatt giving loud verbal commands even after the Jeep began driving forward. Waddell therefore contends that Deputy Mynatt's version of events is contradicted and that there is a question of fact concerning whether the Jeep hit him. Even assuming the Jeep did not hit

As noted above, Waddell also asserts a Fourteenth Amendment claim against the Deputies. She asserts that she "has made a Fourteenth Amendment claim against Deputy Mynatt and Deputy Stegall for the deliberate indifference they had for her safety and well-being." [163] at p. 14. When considering Waddell's Fourteenth Amendment claims against the other law enforcement officers in its previous Order and Memorandum Opinion [145], the Court dismissed the Fourteenth Amendment claims at the outset, noting that claims for excessive force are properly analyzed under the Fourth Amendment—not the Fourteenth Amendment. *See Bros v. Zoss*, 837 F.3d 513, 518 (5th Cir. 2016) (citing Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) ("[W]e are instructed to analyze all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen . . . under the Fourth Amendment and its reasonableness standard[.]") (internal quotation marks omitted).

In her Response [163] to the present Motion [155], Waddell argues that the Fourteenth Amendment claims against Deputy Mynatt and Deputy Stegall should not be disposed of in this fashion:

> The U.S. Supreme Court and other Circuits have recognized a Fourteenth Amendment violation may occur during a pursuit if the pursuing officer intends to harm the fleeing suspect; intends to worsen the suspect's legal plight; causes injury by the intentional misuse of his vehicle; has a purpose to cause harm unrelated to the arrest; intends to punish the suspect; or otherwise acts arbitrarily in the constitutional sense. *See County of Sacramento v. Lewis*, 523 U.S. 833, 854, n. 13 (1998); *Collins v. City of Harker Heights*, 503 U.S. 115 (1992); *Meals v. City of Memphis*, 493 F.3d 720, 730 (6th Cir. 2007); *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir. 1997). While it is true an excessive force claim is viewed through the Fourth Amendment, these separate claims involve due process where the focus lies with the Fourteenth Amendment. *See id*. Further, unauthorized police behavior in contexts other than police

---

Deputy Mynatt, the Court's conclusion would be unchanged. The Court relies on the above balancing of the respective interests to support that decision.

> pursuits might shock the conscience and cause Section 1983 liability. *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (citing Lewis, 523 U.S. at 850) . . . Deputies Mynatt and Stegall argue Waddell's Fourteenth Amendment claim is in actuality a Fourth Amendment claim and should be precluded because it is really 'just an excessive force claim masquerading as a due process violation.' Def. Mot. Summ. Judg. p. 11. *However, both Deputies overlook that the Fourth Amendment provides no text source of constitutional protection for constitutional deprivations involving an intent to injure and worsening an individual's legal plight*. Those claims spring directly from the substantive due process protections provided by the Fourteenth Amendment. *See Lewis*, 523 U.S. at 843.

[163] at p. 14-15 (emphasis added).

Relying on these authorities, Waddell ultimately contends that "[o]n the facts and evidence a juror might reasonably find the Deputies' actions were intended to harm and/or worsen Waddell's legal position, which is the crux of her Fourteenth Amendment claim." *Id*. at p. 16.

Even assuming Waddell's contention that her Fourteenth Amendment claims are not subsumed, the claims still fail. Despite her generalized assertions to the contrary, she has come forward with no evidence to show that the Deputies took any actions to intentionally injure her or any occupant of the vehicle. She has attached no deposition testimony or other summary judgment type evidence illustrating that the Deputies knew who was driving the Jeep or that she was a passenger in the Jeep. She did not provide any testimony of Rice or any other person to contradict the explanations the Deputies provided.

Waddell has come forward with nothing more than speculation and conclusory allegations to support her contention that the Deputies were doing anything other than seeking to prevent further danger to themselves and the public. *See Nabors*, 2019 WL 2617240 at *1. Summary judgment is appropriate, and it is hereby GRANTED in the Deputies' favor as to her Fourteenth Amendment claim.

*II.     Tishomingo County*

Waddell has asserted two claims against Tishomingo County. First, she asserts a failure to train claim, wherein she alleges that the County is liable pursuant to 42 U.S.C. § 1983 for the constitutional violations Deputies Mynatt and Stegall committed.

In the absence of a deprivation of a right secured by federal law, Section 1983 municipal liability cannot be sustained. *See Roberson v. McDonald Transit Assocs., Inc.*, 574 F. App'x 323, 326 (5th Cir. 2014) (citing *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004)). Because the Court, based upon the analysis set forth above, has found no constitutional violation occurred, there can be no municipal liability against Tishomingo County. *See Thompson v. Beasley*, 309 F.R.D. 236, 249 (N.D. Miss. July 13, 2015) (quoting Hale v. Bexar Cnty., 342 F. App'x 921, 925 (5th Cir. 2009)) ("A municipality cannot be held liable under § 1983 if there is no underlying constitutional violation.") (additional citation omitted). Consequently, Waddell's Section 1983 claim against Tishomingo County for failure to train is hereby dismissed.

In addition to the federal claim, Waddell asserts a state law negligence claim against Tishomingo County. The Mississippi Tort Claims Act provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to suit. MISS. CODE ANN. § 11-46-7(1); *see also Moore v. Carroll Cnty., Miss.*, 960 F. Supp. 1084, 1088 (N.D. Miss. 1997). While the MTCA provides a limited waiver of governmental entities' sovereign immunity for claims for monetary damages arising out of the torts of the entities' employees, it further provides that "a governmental entity and its employees acting within the course and scope of their employment duties shall not be liable for any claim . . . [a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activites related to police or fire protection *unless the employee acted in reckless disregard* of the safety

14

and well-being of any persons not engaged in criminal activity at the time of the injury." MISS. CODE ANN. § 11-46-9(1)(c) (emphasis added).

In light of this statutory language, for Tishomingo County to be held liable under state law, Waddell must establish that Deputies Mynatt and Stegall acted with reckless disregard. Reckless disregard is exhibited "when the conduct involved evinced not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Titus v. Williams*, 844 So.3d 459, 468 (Miss. 2003) (citation and internal quotation marks omitted).

The Court finds that the police-protection exemption is applicable. As noted above, to find that the subject officers acted with reckless disregard, the Court must first find that the conduct involved the appreciation of an "unreasonable risk." *See id*. In the analysis set forth above, when considering Waddell's Fourth Amendment claim, the Court found that the Deputies' use of force was reasonable under the circumstances. In reaching that conclusion, the Court considered all the risks at play, including the risk the Jeep posed to the officers and the general public as well as the risk the Deputies' use of force posed to the occupants of the Jeep. The Court ultimately concluded that Deputies Mynatt and Stegall's use of force was reasonable. The Court sees no need to depart from that logic here. Despite viewing the facts in the light most favorable to Waddell, she has not established a genuine issue of material fact on the point of whether the Deputies acted with reckless disregard. Summary judgment is hereby GRANTED in Tishomingo County's favor on that claim.

*Conclusion*

For the reasons set forth above, the Motions [155, 157] are GRANTED. All claims are dismissed *with prejudice*. A Judgment consistent with this Memorandum Opinion will issue this day.

SO ORDERED, this the 3rd day of March, 2022.

/s/ Sharion Aycock  
UNITED STATES DISTRICT JUDGE